*By order of the Bankruptcy Appellate Panel, the precedential effect
of this decision is limited to the case and parties pursuant to 6th
Cir. BAP LBR 8013-1(b). See also 6th Cir. BAP LBR 8010-1(c).*

File Name: 16b0005n.06

# BANKRUPTCY APPELLATE PANEL OF THE SIXTH CIRCUIT

| | | |
|---|---|---|
| In re: THOMAS R. SHEIDLER;<br>MARGARET J. SHEIDLER, | ) | |
| | ) | |
| Debtors. | ) | |
| _____ | ) | |
| | ) | No. 15-8011 |
| SAMUEL GAFT; MARILYN CIBOR, | ) | |
| | ) | |
| Plaintiffs - Appellants, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THOMAS R. SHEIDLER; MARGARET J.<br>SHEIDLER, | ) | |
| | ) | |
| Defendants - Appellees. | ) | |
| | ) | |
| | ) | |

Appeal from the United States Bankruptcy Court
for the Western District of Michigan
Case No. 11-08761; Adv. No. 11-80618.

Decided and Filed: March 28, 2016

Before: HARRISON, HUMPHREY, and PRESTON, Bankruptcy Appellate Panel Judges.

_____

## COUNSEL

ON BRIEF: Daniel P. Feinberg, THE MEISNER LAW GROUP, P.C., Bingham Farms,
Michigan, for Appellants. Sean M. Liles, Traverse City, Michigan, for Appellees.

————————————————

**OPINION**

————————————————

**MARIAN F. HARRISON**, Bankruptcy Appellate Panel Judge.  Following a trial, Samuel Gaft and Marilyn Cibor ("Plaintiffs") filed this appeal from the bankruptcy court's dismissal of their dischargeability complaint against Thomas R. Sheidler and Margaret J. Sheidler ("Debtors") for failure to state a cause of action.  For the reasons stated below, the Panel affirms the bankruptcy court's ruling.

## I.  ISSUES ON APPEAL

Whether the bankruptcy court's findings with respect to the dischargeability of the debt owed to the Plaintiffs under 11 U.S.C. § 523(a)(2)(A) and findings with respect to objections to discharge under 11 U.S.C. § 727(a)(3) and/or (a)(4)(A) were clearly erroneous, and whether the bankruptcy court erred by refusing to address dismissal of the underlying bankruptcy case for bad faith under 11 U.S.C. § 707(b)(3).[1]

## II.  JURISDICTION

The United States District Court for the Western District of Michigan has authorized appeals to the Panel, and no party has timely elected to have this appeal heard by the district court.  28 U.S.C.

---

[1]In addition, the Debtors seek costs under Federal Rule Bankruptcy Procedure 8021(a)(2) and assert that this appeal is frivolous and that double costs for the appeal, as well as fees and costs for a successful mediation, should be awarded under Federal Rule Bankruptcy Procedure 8020.  Pursuant to Federal Rule Bankruptcy Procedure 8020, "[i]f the district court or BAP determines that an appeal is frivolous, it may, *after a separately filed motion or notice from the court and reasonable opportunity to respond*, award just damages and single or double costs to the appellee." (emphasis added).  If the Debtors wish to pursue this matter, a separate motion should be filed for the Panel's consideration.  Of course, because the Panel affirms the bankruptcy court's decision, costs of the appeal are taxed against the appellants.  Fed. R. Bankr. P. 8021(a)(2).

§ 158(b)(6), (c)(1).  A final order of the bankruptcy court may be appealed as of right pursuant to 28 U.S.C. § 158(a)(1).  For purposes of appeal, a final order "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment."  *Midland Asphalt Corp. v. United States*, 489 U.S. 794, 798, 109 S. Ct. 1494, 1497 (1989) (citations and internal quotations omitted).  "Determinations of dischargeability are final orders for purposes of appeal." *Lowry v. Nicodemus* (*In re Nicodemus*), 497 B.R. 852, 854 (B.A.P. 6th Cir. 2013) (citation omitted).

### III.  STANDARD OF REVIEW

Legal determinations concerning dischargeability are reviewed de novo.  *In re Nicodemus*, 497 B.R. 852, 855 (B.A.P. 6th Cir. 2013).  Similarly, the application of the law for the denial of a discharge is reviewed de novo.  *Roberts v. Erhard (In re Roberts)*, 331 B.R. 876, 880 (B.A.P. 9th Cir. 2005).

Factual findings are reviewed for clear error.  *Rembert v. AT&T Universal Card Servs., Inc.* (*In re Rembert*), 141 F.3d 277, 280 (6th Cir. 1998).  "A finding of fact is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Riverview Trenton R.R. Co. v. DSC, Ltd.* (*In re DSC, Ltd.*), 486 F.3d 940, 944 (6th Cir. 2007) (internal quotation marks and citations omitted).  Even greater deference is given when findings of fact are based on determinations regarding the credibility of the witnesses. *Hamilton v. Carell*, 243 F.3d 992, 997-98 (6th Cir. 2001) (citation omitted).

### IV.  FACTS

In 1996, the Debtors purchased real property in Suttons Bay, Michigan, known as the Stone Schoolhouse.  The Debtors operated the property as a bed and breakfast.  However, this venture was not particularly successful, so the Debtors decided to convert the property into condominiums.  To facilitate the condominium development, the Debtors formed Stone Schoolhouse, LLC ("LLC") and transferred the real property into the company.  The LLC took out a commercial loan (about

$600,000) with Northwestern Bank, granting a mortgage on units one, two, three, and five of the real property. The funds were used to pay off the Debtors' underlying debt on the property. In its opinion, the bankruptcy court did not draw a distinction between the Debtors and the LLC.

In 2006, the Plaintiffs were considering buying a retirement home in Northern Michigan. The Plaintiffs hired a real estate agent, who showed them several properties, including the Stone Schoolhouse Condominiums. On March 5th or 6th of that year, the Plaintiffs met with the Debtors, their real estate agent, and George Newpower ("Newpower"), a local builder, at the Stone Schoolhouse property. A follow-up meeting was held by the same parties on March 18, 2006, to discuss what was being offered for the $270,000 purchase price for unit four. Prior to purchasing unit four, the Plaintiffs reviewed one document regarding the Stone Schoolhouse Condominiums that was prepared by Mr. Sheidler for purposes of marketing. The Plaintiffs point to two statements in the document as being material misrepresentations:

> We believe that we have the best interior designer & the most meticulous builder who stand ready to bring your taste & desire into your personal living space.
>
> * * * *
>
> The developer lives on site so you have the confidence that everything will be done correctly to your complete satisfaction during, before & well after the initial construction is finished.

(Advertising Material, Plaintiff Exh. 1).

The Debtors admitted to being the developers referred to in the later statement, and at the time of this representation, the Debtors did live on-site at the Stone Schoolhouse property. The Debtors later moved off-site after the purchase agreement with the Plaintiffs closed and the construction began on the Plaintiffs' unit. At trial, Mr. Gaft testified that he recalled having the belief that the most important part of this representation was that everything would be done to his complete satisfaction rather than whether the Debtors actually lived on-site. (Trial Tr. vol. 1, 121:17, Adv. Case ECF No. 120).

4

At some point after executing the purchase agreement for unit four, the Plaintiffs were also provided with other written information concerning the Stone Schoolhouse Condominiums. This document provided additional information about the project and included the following statement under a section entitled "BRIEF DESCRIPTION OF THE PROJECT:"

> The Developer has hired Andy Rink, a local architect, and Sara Robinson of Circa Interior Design, to design Unit 3 [the model unit] and Superior Remodeling and Construction, Inc., a local construction firm [owned by Newpower] to complete the build-out of the interior of Unit 3. Purchasers of Units will either retain the Developer and its contractors to design and complete the build-out of the interior of the Unit or retain their own architect and builder to complete the interior of the Unit.

(Project Description, Plaintiff Exh. 3).

The Plaintiffs decided to purchase unit four at the Stone Schoolhouse property, and the follow-up meeting resulted in a purchase agreement for unit four being executed on April 28, 2006. The total purchase price shown on the purchase agreement was $270,000. However, an exhibit to the purchase agreement includes handwritten notes by Mr. Sheidler, indicating that $120,000 was due at various times. Ms. Cibor testified that the $120,000 "were the monies that my husband and I would be responsible for." (Trial Tr. vol. 1, 19:3-4).

An amendment to the purchase agreement, with the date of August 16, 2006, reflects a revised purchase price of $150,000 "as Buyer is going to supply his own construction funds." (Amended Purchase Agreement, Plaintiff Exh. 5). The amendment was signed by Ms. Cibor, but she claims that the document was not signed until sometime in September or October 2006. Mr. Gaft testified that the signature on the amendment was not his.

The sale closed in August 2006. According to the settlement statement, the contract price was $150,000 and the construction funds were $120,000. (Settlement Statement, Plaintiff Exh. 8). The Plaintiffs financed $216,479.05 through Northwestern Bank and paid $59,676.59 in cash to the LLC. This amount included a $10,000 down payment. In return, the title to unit four was transferred

to the Plaintiffs. The $120,000 was held in escrow by Northwestern Bank to be used for the construction of unit four. Neither the Debtors nor the LLC received any portion of the escrowed funds.

After closing, Newpower began the work on unit four even though he had no written agreement with any of the parties. Despite the lack of a written agreement, the Plaintiffs made five payments to Newpower. The first disbursement of $50,000 to Newpower or his company was a draw on the Plaintiffs' construction escrow account at Northwestern Bank on August 24, 2006. The disbursement order states "THE UNDERSIGNED OWNERS JOIN IN AND DO APPROVE OF THIS DRAW REQUEST, AND HAVE RELIED UPON THEIR OWN INDEPENDENT DETERMINATION AND EVALUATION OF THE CONSTRUCTION PROGRESS, COMPLETION COST AND LOAN FUNDS REMAINING AVAILABLE." (Disbursement Order, Defendant Exh. I).

On September 1, 2006, the Plaintiffs paid Newpower $15,000 from their Flint Area School Employees Credit Union account so that Newpower could make a down payment on cabinetry. (Check to Newpower, Plaintiff Exh. 6 at 1). On April 4, 2007, the Plaintiffs made a $10,000 payment from their credit union account to Newpower and his company. (Check to Newpower, Plaintiff Exh. 6 at 2). Ms. Cibor testified that Newpower claimed to have received only $50,000 instead of $60,000 as part of the first draw from the Northwestern Bank escrow account. (Trial Tr. vol. 1 at 30:1-4). On July 2, 2007, the Plaintiffs made a $3000 payment to Newpower and his company in order to secure a fireplace for the bedroom. (Check to Newpower, Plaintiff Exh. 6 at 3). Finally, on July 12, 2007, another $35,222.47 was disbursed from the construction escrow account. (Disbursement Order, Defendant Exh. M). The disbursement order was approved and signed by both Plaintiffs.

While the Plaintiffs did not regularly visit the condo to check on the progress during the winter of 2006-2007, Ms. Cibor testified that the Plaintiffs visited the site once or twice a month in the spring of 2007. During their visits, it became evident that not much work was being done on unit

four. At the time the Plaintiffs wrote the $10,000 check in April 2007, Ms. Cibor testified that the unit had been "roughed in" with some electrical work done. Ms. Cibor also testified that after the last $35,000 draw, no further work was done on unit four.

On March 19, 2007, Newpower prepared a contract between his company and the Plaintiffs for the $120,000 build out. This document was signed by Ms. Cibor in May of 2007. She testified that she signed the document under duress and pressure from Newpower. Mr. Gaft testified that he originally signed the document, changed his mind, and wrote Newpower and told him he was canceling his signature.

In October 2007, it became clear that despite Newpower being in receipt of the money, he would not be finishing the work on unit four. After Newpower defaulted, the Plaintiffs had discussions with Mr. Sheidler and Newpower's nephew about developing an attic unit or finishing unit four for additional funds, but none of these discussions developed into an agreement.

The Plaintiffs stopped making their mortgage payments to Northwestern Bank some time in 2009 and sued the Debtors, the LLC, and others in state court. As part of the resolution, the Plaintiffs gave the deed to Northwestern Bank, and Northwestern Bank released the Plaintiffs from further liability under the note. In addition, the Plaintiffs were paid $92,634.58 by the title insurance company, and as of September 2014, the Plaintiffs had received $6,447.48 in restitution from Newpower as a result of his criminal conviction arising out of this transaction. Shortly before the final pretrial conference in the state court action, the Debtors and the LLC filed for bankruptcy protection on August 23, 2011.

The Plaintiffs filed this adversary complaint on December 12, 2011, asserting that their claim is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) and that the Debtors should be denied a discharge pursuant to 11 U.S.C. § 727(a)(3) and (a)(4)(A). The Plaintiffs filed an amended

7

complaint on November 15, 2013.[2] A trial was held on September 15 and 16, 2014. Both Debtors and both Plaintiffs testified, and the bankruptcy court found them all to be credible witnesses. In their post-trial brief, the Plaintiffs asserted that their claim was nondischargeable pursuant to 11 U.S.C. § 523(a)(4) and that the case should be dismissed pursuant to 11 U.S.C. § 707(b)(3) because the petition was filed in bad faith. The bankruptcy court ruled telephonically on February 24, 2015, and an order dismissing the adversary was entered on February 26, 2015.

## V. DISCUSSION

The Plaintiffs do not dispute that the bankruptcy court applied the correct legal standards. Instead, the Plaintiffs assert that the bankruptcy court's findings of fact were clearly erroneous.

### A. 11 U.S.C. § 523(a)(2)(A)

The bankruptcy court held that the Plaintiffs failed to meet their burden of showing that the debt owed to them by the Debtors was nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).

Exceptions to discharge are to be construed strictly against the creditor. *Gleason v. Thaw*, 236 U.S. 558, 562, 35 S. Ct. 287, 289 (1915). The burden of proof falls upon the party objecting to discharge to prove by a preponderance of the evidence that a particular debt is nondischargeable. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S. Ct. 654, 661 (1991).

Section 523(a)(2)(A) denies discharge of a debt:

> for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by –

---

[2]Neither the complaint nor the amended complaint were designated to be included in the record on appeal.

> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]

11 U.S.C. § 523(a)(2)(A).

The Sixth Circuit has held that:

> [i]n order to except a debt from discharge under § 523(a)(2)(A), a creditor must prove the following elements: (1) the debtor obtained money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation; and (4) its reliance was the proximate cause of loss.

*Rembert,* 141 F.3d at 280-81 (citation and footnote omitted). Under *Rembert*, intent is measured subjectively. *Id.* at 281. "[A] debtor's intent to deceive a creditor occurs when the debtor makes a false representation which the debtor knows or should have known would induce another to advance money, goods or services to the debtor." *Bernard Lumber Co. v. Patrick* (*In re Patrick*), 265 B.R. 913, 916 (Bankr. N.D. Ohio 2001) (citation omitted). An intent to deceive may be inferred from a "'[r]eckless disregard for the truth or falsity of a statement combined with the sheer magnitude of the resultant misrepresentation.'" *Haney v. Copeland* (*In re Copeland*), 291 B.R. 740, 786 (Bankr. E.D. Tenn. 2003) (citation omitted). Nonetheless, "'[i]f there is room for an inference of honest intent, the question of nondischargeability must be resolved in favor of the debtor.'" *Star Banc Fin., Inc. v. Bird* (*In re Bird*), 224 B.R. 622, 627 (Bankr. S.D. Ohio 1998) (citations omitted).

In ruling on this issue, the bankruptcy court went through the *Rembert* factors thoroughly and methodically:

> To begin, the Court notes that the only money the Debtors or the LLC received from the Plaintiffs was the $150,000.00 contract sales price for unit four. The original purchase agreement stated that the total purchase price for unit four was to be $270,000.00.

9

However, the purchase agreement was amended in August 2006 to change the purchase price to $150,000.00 because the Plaintiffs were to "supply their own construction funds."

Although Ms. Cibor disputes the date in which she had signed this amendment, and Mr. Gaft asserts that he never signed it at all, the terms of this revised agreement are incorporated into the settlement statement.

There is no question that both the Plaintiffs signed the settlement statement at the closing on August 18, 2006.

There is likewise no dispute that the funds were actually handled as provided in the settlement statement.

The $120,000.00 in construction funds were placed in escrow with Northwestern Bank. Payment of these funds began subject to a separate proposal/contract between the Plaintiffs and George Newpower on behalf of Superior Remodeling.

The agreement is dated March 19, 2007, and was signed by Ms. Cibor in May of 2007.

Transfers of these construction funds to Newpower were made pursuant to separate draw requests, each of which were approved by the Plaintiffs.

Additional amounts were paid directly to Newpower and Superior via personal checks from the Plaintiffs.

For its part, Stone Schoolhouse received a total of $150,000.00 as a result of closing of the transaction to transfer title to the property to the Plaintiffs. By doing so, the Debtors and Stone Schoolhouse fulfilled their obligation under the purchase agreement, as amended.

The Plaintiffs have failed to establish that the Debtor and/or Stone Schoolhouse owed them any other debt.

The Court recognizes that a debtor may "obtain money" for purposes of 523(a)(2)(A) even if the benefit received by the debtor is only indirect.

Creditor need not show that the debtor directly and personally received every dollar lost by the creditor to establish non-dischargeable debt for fraud.

However, even if the Court views the transaction more broadly and considers whether the Debtors made any fraudulent misrepresentations that caused the Plaintiffs to enter into the purchase agreement as a whole, the Plaintiffs have failed to establish the first element of the *Rembert* test.

The Plaintiffs claim that the Debtors deceived them initially through certain documents presented to them prior to entering into the purchase agreement for unit four. However, the evidence established that the only document, Plaintiffs' exhibit 1, was reviewed by the Plaintiffs prior to entering into the purchase agreement.

Mr. Sheidler prepared Plaintiffs' exhibit 1 for his real estate agent to use in marketing the Stone Schoolhouse property. The second page contains two statements that the Plaintiffs assert constitute fraudulent misrepresentations for purposes of 523(a)(2)(A).

One, "We believe we have the best interior designer and most meticulous builder who stands ready to bring your taste and desire into your personal living space."

Two, "The developer lives on-site, so you have the confidence that everything will be done correctly to your complete satisfaction during, before, and well after the initial construction is finished."

There is no evidence to establish that these representations were false, that the Debtors knew them to be false at the time they were made, or that they were made as gross recklessness as to the truth.

As to the first, "We believe we have the most meticulous builder," based upon having Newpower at the meetings, et cetera, the Court does find that Newpower/Superior was the builder referenced therein. He was held out by the Debtors as their builder, and the Debtors had actually entered into a separate agreement with Newpower/Superior for the build out of unit four.

There is no evidence in the record to show that at the time the statement was made that the Debtors knew that describing Newpower/Superior as a meticulous builder was false, or that the statement was made with gross recklessness as to its truth. "Meticulous" means "showing great attention to detail, very careful and precise."

Further, describing Newpower as meticulous is an opinion, not a current or past fact.

Although there is evidence in the record that suggests that Newpower was dishonest, there is no evidence as to whether Newpower was or wasn't meticulous or not, based upon anyone's opinion.

The second quote, "The developer lives on-site, so you have the confidence that everything will be done correctly to your complete satisfaction during, before, and well after the initial construction is finished."

11

Mr. Sheidler did testify that the developers referred to in this statement are he and Mrs. Sheidler. However, this statement was not false at the time it was made. All of the evidence presented at trial established that the Debtors did live on-site at the time the representation was made.

Although they later found out this did not occur until after the purchase agreement with the Plaintiffs was signed, and after construction had started on unit four, this statement does not constitute a misrepresentation of material fact.

Plaintiffs also point to exhibit 2, which was specific to unit three as opposed to unit four, which is the Plaintiffs' unit, and which contains statements regarding George Newpower. However, exhibit 2 was not reviewed by Ms. Cibor prior to the signing of the purchase agreement.

And Mr. Gaft also acknowledged not seeing it pre-purchase agreement.

Therefore, the representations made in this document could not have been material to the Plaintiffs' decision to enter into the purchase agreement.

Plaintiffs also point to the purchase agreement paragraph (2)(c), "Seller will use its best efforts to complete the property as soon as reasonably practicable, and in any event, except as stated below, not later than three months from the date purchaser notifies seller in writing that they have amendment for financing."

Again, once the purchase agreement was modified, the Debtor, as sellers, were not responsible for completing the build out, and "the seller or its contractor will grant an express limited warranty on the property."

This paragraph then references an exhibit to the purchase agreement, which, by its own terms at paragraph (a)(2)(B), provides that ["]the [D]eveloper does not give a warranty on any improvements completed by the [P]urchaser of a [U]nit or their contractor[s]."

Therefore, this provision does not apply.

The Plaintiffs have not shown that the Defendant Debtors knowingly made any misrepresentations that were false.

The second *Rembert* factor, misrepresentations were made with the intent to deceive the creditor. There is no evidence that the Debtors intended to deceive the Plaintiffs in this transaction.

Fraudulent intent is a subjective question and requires the Plaintiffs to prove that the Debtors acted with "an actual intent to mislead, which is more than mere negligence[.]"

A debtor's fraudulent intent may be inferred when the totality of circumstances surrounding a given transaction "present a picture of deceptive conduct by the debtor, which indicates an intent to deceive the creditor."

If room exists for the Court to infer honest intent, the issue of dischargeability must be decided in favor of the debtor.

The circumstances of this case do not paint a picture of deceptive conduct on the part of the Debtors. As previously noted, the Court is unable to conclude that the Debtors misrepresented any material facts to the Plaintiffs.

And even if the Court were to conclude that some of the misrepresentations made by the Debtor were untrue, there is no evidence to suggest that the Debtors intended to deceive the Plaintiffs.

To the contrary, the evidence suggests that the only deceptive dishonest party in this transaction was Newpower.

The third *Rembert* factor that the Plaintiffs justifiably relied on misrepresentations, the Court believes that the Plaintiffs relied on the Debtors' representations that Newpower was a meticulous builder.

Under the circumstances, this reliance was justifiable.

It is less clear that the Plaintiffs relied on the Debtors' representation that they lived on-site. Both Plaintiffs testified that this representation suggested to them that Mr. Sheidler would be closely supervising construction. Mr. Gaft acknowledged, however, that where the Debtors lived was not a major consideration for the Plaintiffs.

Nevertheless, the Plaintiffs' reliance does not change the fact that the Debtors' statements were not false when they were made, and were not made with the intent to deceive.

The Plaintiffs' reliance is not sufficient standing alone to establish a non-dischargeable debt for fraud.

The fourth *Rembert* factor, reliance resulting in proximate cause of loss. Even if the Plaintiffs had successfully established the other elements of their fraud claim, the Court cannot conclude that the alleged misrepresentations, or any other conduct by the Debtors, were the proximate cause of the Plaintiffs' losses.

Proximate cause requires . . . a direct link between the alleged fraud and the creation of the debt.

Here, there is no direct link between the Debtors' representations and the losses suffered by the Plaintiffs. The evidence conclusively established that it was

13

Mr. Newpower's fraudulent conduct that caused everyone, not just the Plaintiffs, but also the Debtors, the sustained financial losses in this transaction.

(Telephonic Bench Opinion Tr. 22:1 - 30:8, Adv. Case ECF No. 135, Feb. 24, 2015) ("Opinion Tr.") (internal citations omitted).[3]

The bankruptcy court also held that the Plaintiffs could not circumvent the causation issue by arguing that the Debtors were responsible for Newpower's tortious actions because Newpower was not acting as the Debtors' agent.

Under Michigan law, an agent's authority may be actual or apparent. "'An agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act.'" *Mais v. Allianz Life Ins. Co. of N. Am.*, 34 F. Supp. 3d 754, 762 (W.D. Mich. 2014) (citation omitted). In contrast, "'[a]pparent authority is the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations.'" *Id.* (citation omitted). Apparent authority cannot be established by the acts and conduct of the agent. Instead, it must be traceable to the principal. *Id.* (citation omitted). "[A] principal may be vicariously liable for an agent's tortious conduct based upon an apparent authority theory, if the principal cloaked its agent with apparent authority, i.e., held the agent out to third parties as possessing sufficient authority to commit the particular act in question,

---

[3]Instead of designating the transcript of the Telephonic Bench Opinion, the Plaintiffs' designated the "Virtual Minutes" of the bench opinion (Adv. Case ECF No. 127) as part of the record on appeal. The Debtors did not submit a designation of record on appeal, however, they did include an Addendum to their appellee brief requesting that the transcript of the Telephonic Bench Opinion be included in the record on appeal. Accordingly, the Panel has considered the transcript of the telephonic bench opinion in reviewing this appeal. The Panel presumes that the plaintiffs' designation of the "Virtual Minutes" of the bench opinion, rather than the transcript of the opinion itself was simply a clerical error.

and there was reliance upon the apparent authority." *Jones v. Federated Fin. Reserve Corp.*, 144 F.3d 961, 965 (6th Cir. 1998) (citations omitted).

In this case, the bankruptcy court correctly held that Newpower never had actual authority to act as the Debtors' agent and that the Debtors never manifested an intent to have Newpower act on their behalf so as to establish an apparent agency relationship. Specifically, the bankruptcy court made the following findings:

> In this case, the only evidence before the Court as to Newpower was that he was referred to as the Debtors' builder in Plaintiffs' exhibit 1. Any suggestion that this statement could be construed as giving Newpower apparent authority to act on behalf of the Debtors is belied by the other evidence in this case, including the statement in Plaintiffs' exhibit 3, that the Plaintiffs could either hire Newpower or retain their own contractor to complete construction of the condo unit, the evidence that Newpower had a separate agreement with the Debtors to complete the build out of unit three, which is not the Plaintiffs' unit, and most importantly that Newpower and Superior also had a separate direct agreement with the Plaintiffs for the build out and construction of unit four.
>
> None of this evidence supports a finding that the Debtors held Newpower out as their agent in the construction of the Stone Schoolhouse Condominiums generally, or as to the build out of unit four specifically.
>
> Other than identifying Newpower as the builder in the marketing materials, the Debtors gave Plaintiffs no reason to believe that Newpower had the authority to act on their behalf.
>
> To the contrary, the purchase agreement, as amended, separated the construction funds build out from the purchase of the property. Thereafter, the Plaintiffs retained Newpower pursuant to a separate contract with Superior Remodeling. The Plaintiffs approved Newpower's request for construction draws, and made additional payments to him directly. Newpower was not the Debtors' agent.

(Opinion Tr. 31:16 - 32:19).

Finally, the bankruptcy court considered whether there was actual fraud under 11 U.S.C. § 523(a)(2) and determined that the same facts which precluded a finding of fraudulent

misrepresentation, "including the Debtors' lack of intent to deceive Plaintiffs, and the failure to establish a causal link between the Debtors' conduct and the Plaintiffs' losses" precluded it from finding that the Debtors committed actual fraud. (Opinion Tr. 34:22-24).

The bankruptcy court's finding that the debt owed to the Plaintiffs is dischargeable is supported by the record and is not clearly erroneous.

## B. 11 U.S.C. § 523(a)(4)

Although 11 U.S.C. § 523(a)(4) was not raised until the post-trial briefs, the bankruptcy court considered whether the proof conformed to a finding that the Debtors should be held responsible for the embezzlement of Newpower under a theory of agency.[4]

11 U.S.C. § 523(a)(4) provides, in relevant part, that a discharge can be denied as to a debt for "embezzlement." As discussed above, the bankruptcy court correctly applied Michigan law to determine that Newpower did not act as the Debtors' agent, and therefore, the Debtors could not be held responsible for Newpower's embezzlement.

## C. 11 U.S.C. § 727(a)(4)(A)

The Plaintiffs assert that the bankruptcy court's findings regarding 11 U.S.C. § 727(a)(4)(A) were also clearly erroneous.

A discharge can be denied under § 727(a)(4)(A) when a debtor knowingly and fraudulently makes a false oath in connection with a bankruptcy proceeding. "'The fundamental purpose of § 727(a)(4)(A) is to insure that the trustee and creditors have accurate information without having to do costly investigations.'" *United States Tr. v. Zhang* (*In re Zhang*), 463 B.R. 66, 86 (Bankr. S.D. Ohio 2012) (citation omitted). In order to deny a debtor's discharge under § 727(a)(4)(A), a plaintiff

---

[4]Pursuant to Federal Rule of Civil Procedure 15(b)(2), as incorporated by Federal Rule of Bankruptcy Procedure 7015, "[w]hen an issue is not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings."

16

must establish by a preponderance of the evidence the following five elements: "1) the debtor made a statement under oath; 2) the statement was false; 3) the debtor knew the statement was false; 4) the debtor made the statement with fraudulent intent; and 5) the statement related materially to the bankruptcy case." *Keeney v. Smith* (*In re Keeney*), 227 F.3d 679, 685 (6th Cir. 2000) (citation omitted). An analysis under § 727(a)(4)(A) is a question of fact. *Id.* (citation omitted). The bankruptcy court made the following findings on this issue:

> At trial, Mr. Sheidler was examined as to the accuracy of his bankruptcy paperwork by both counsel for the Plaintiff and his own counsel. He was examined as to a reaffirmation agreement with Chase Bank, which was filed with the Court on August 29, 2012.
>
> He was examined concerning his Schedule D concerning a listing of the Northwestern Bank mortgage, his Schedule A concerning the value of his house, his sailboat, and the 2006 Jeep co-owned with his son, the inclusion of the student debt loan of his daughter, and the Silverman obligation on his Schedule L, and the monthly income disclosed on his Schedule I.
>
> After reviewing the pleadings and exhibits in this case, and hearing the testimony of Mr. and Mrs. Sheidler, the Court concludes that no false oaths were made by the Debtors.
>
> Further, even if the Court were to find that the information on the Debtors' documents were not entirely accurate, there is no evidence that any inaccuracies were material to the case or that misstatements were made with the intent to deceive the Trustee or creditors.
>
> Mr. Sheidler offered credible testimony, explaining why the Debtors had disclosed certain disputed debts, including Northwestern Bank mortgage and the line of credit from Silverman on their bankruptcy Schedules.
>
> He also offered credible explanations as to the valuation of assets and the changes in income he had experienced since the filing of the Chapter 7 case.
>
> The only close call from the Court's viewpoint is the Debtors' Schedule I concerning income at the time of the filing of the bankruptcy case.
>
> Specifically, Debtors' Schedule I, back at number 15, did not include the Social Security income of Mr. Sheidler's 97 year old mother. Mr. Sheidler acknowledged this during his testimony.

After reviewing Schedule I and the instructions for Schedule I, the Court concludes that disclosure of her income – her Social Security income is not required. However, even if it had been disclosed on Schedule I, its inclusion would have had no consequence.

Neither the omission of the Social Security income nor its inclusion on Schedule I would have been material to the bankruptcy case.

First, this is a case in which debts are not primarily consumer debts pursuant to 11 U.S.C. 707(b)(1). Had the mother's Social Security income been disclosed, and there's no evidence in the record as to the amount of the Social Security income at the time of the filing, it would not have affected the outcome of the bankruptcy.

Because this is not a case in which debts are primarily consumer debts, excess income would not give rise to a presumption of abuse under 707(b)(2)(A).

More importantly, any questions pertaining to income and expenses or the other bankruptcy Schedules were reviewed by the Chapter 7 Trustee, who filed a report of no distribution in this case on December 12, 2011.

(Opinion Tr. 35:23 - 38:3) (internal citations omitted).

The testimony showed that at the time the Debtors filed their bankruptcy petition, there were seven people living in their home: the Debtors, the husband's 97-year-old mother, a son with a mental disability, and a daughter with her two children. Mr. Sheidler was unemployed, and his unemployment benefits had stopped prior to filing for bankruptcy. The daughter was unemployed and not receiving regular child support payments. The son's income was approximately $20,000. While the bankruptcy court failed to address the fact that the son's income was not listed on Schedule I, there was no proof that this omission would have affected the outcome of the bankruptcy. Based upon these facts, the bankruptcy court's findings concerning the § 727(a)(4) count were not clearly erroneous.

## D. 11 U.S.C. § 727(a)(3)

The Plaintiffs assert that the bankruptcy court's findings regarding 11 U.S.C. § 727(a)(3) were also clearly erroneous.

Pursuant to § 727(a)(3), a discharge is denied if "the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act . . . was justified under all the circumstances of the case." In order to sustain an objection to discharge under § 727(a)(3), the evidence must show that:

> (1) either that the debtor failed to keep or preserve any recorded information, including books, documents, records and papers, or that the debtor or someone acting for him destroyed, mutilated, falsified, or concealed any recorded information including books, documents, records and papers; and (2) that as a result, it is impossible to ascertain the financial condition and material business transactions of the debtor. The party seeking denial of a discharge has the burden of proving the inadequacy of the debtor's records. However, [o]nce a debtor's records are determined to be inadequate, the burden is on the debtor to establish any justification therefor.

*Solomon v. Barman* (*In re Barman*), 244 B.R. 896, 900 (Bankr. E.D. Mich. 2000) (internal quotation marks and citations omitted).

A review of the trial transcripts reflects that no questions were asked regarding the Debtors' record keeping, nor were any exhibits introduced to show that the Debtors failed to keep or preserve records. The bankruptcy court correctly held that there was no evidence to support this count.

## E. 11 U.S.C. § 707

On appeal, the Plaintiffs assert that the Debtors' bankruptcy case should have been dismissed pursuant to 11 U.S.C. § 707(a) and/or (b). As to 11 U.S.C. § 707(a), the Plaintiffs argue that the case should have been dismissed because "[t]hese Debtors filed on the eve of trial when the Plaintiffs' claims are the only substantial debt they have, and they have the ability to pay their debts." (App.

Brief at 26, June 11, 2015, B.A.P. Case ECF No. 17). Regarding 11 U.S.C. § 707(b), the Plaintiffs assert that by overstating the amount of non-consumer debt owed and undervaluing the income and assets, the Debtors were attempting to circumvent the Chapter 7 Means Test and avoid the presumption of abuse that would arise under 11 U.S.C. § 707(b)(2)(A). Even without this presumption, the Plaintiffs assert that the case should be dismissed for bad faith pursuant to 11 U.S.C. § 707(b)(3).

In ruling that the issue of dismissal was not properly presented, the bankruptcy court stated:

> The Court notes that the dismissal of a case under Section 707 involves a different legal standard in the question of whether a debtor's discharge should be denied under 727(a).
> The Plaintiffs have never formally pled a cause of action under Section 707, either in this adversary proceeding or in separate motion.

> The question before the Court in this adversary proceeding is, and always has been, whether the Debtors intentionally made materially false oaths in their bankruptcy case such that the discharge should be denied. The Court finds that they did not.

(Opinion Tr. 38:23 - 39:9).

The Plaintiffs contend that the bankruptcy court's finding that they never formally pled a cause of action under § 707 either in the adversary proceeding or in a separate motion was clearly erroneous. The Plaintiffs assert that they first raised these claims in their pretrial statement, then in their responses to a motion for summary judgment, and in their pre- and post-trial briefs. The Plaintiffs' admission that this argument was not raised in their complaint, amended complaint, or in a separate motion supports the bankruptcy court's finding. A pleading is defined in Federal Rule of Civil Procedure 7(a), made applicable by Federal Rule of Bankruptcy Procedure 7007, and none of the documents listed by the Plaintiffs constitute a formal pleading.

Moreover, when the Plaintiffs raised § 707 issues, it was under the heading "Non-dischargeability in general." (Plaintiffs' Trial Brief at 7, Sept. 11, 2014, Adv. Case ECF No. 117;

Plaintiffs' Post-Trial Brief at 10, Oct. 7, 2014, Adv. Case ECF No. 122).[5]  In the Plaintiffs' pre- and post-trial briefs the Plaintiffs state "[e]ven if the facts did not rise to the level of an egregious case to deny Debtor discharge under § 707(a), it is clear that the facts would still allow this Honorable Court to deny Debtors' discharge pursuant to § 707(b)(3)." (Plaintiffs' Trial Brief at 7-8; Plaintiffs' Post-Trial Brief at 11).  It appears that the Plaintiffs have argued that the Debtors should be denied a discharge based on application of § 707.  Unfortunately for the Plaintiffs, the legal standards under § 707 and § 727(a) are not interchangeable, and there is nothing in the record before this Panel that indicates the bankruptcy court erred in finding that a cause of action to dismiss under § 707 was never formally pled.

Finally,  the Plaintiffs' argument that Federal Rule of Civil Procedure 15(b)(2) required the bankruptcy court to consider § 707 is without merit.  The Plaintiffs submit that the § 707 claims were "virtually always part of the case," that the Debtors did not object, and that the matter was tried by the parties. (App. Brief at 25, June 11, 2015, B.A.P. Case ECF No. 17).  The bankruptcy court ruled that "[t]he question before the Court in this adversary proceeding is, and always has been, whether the Debtors intentionally made materially false oaths in their bankruptcy case such that the discharge should be denied." (Opinion Tr. 39:5-8).  The Plaintiffs' references to their pretrial statement, responses to summary judgment, and pre- and post-trial briefs, are insufficient to indicate that there was express or implied consent on the part of the debtors to consideration of these issues, or that these issues were tried by the parties over the two-day trial.  Accordingly, the bankruptcy court did not abuse its discretion by refusing to consider any § 707 issues. *See Ale v. TVA*, 269 F.3d 680, 692 (6th Cir. 2001) (trial court's decision whether to amend under Rule 15(b) is reviewed for abuse of discretion).[6]

---

[5]The Plaintiffs' pretrial statement and responses to summary judgment were not designated to be included in the record on appeal.

[6]Even if the Plaintiffs' pretrial statement, responses to summary judgment, and pre- and post-trial briefs could be construed as formally pleading a cause of action under 11 U.S.C. § 707, or if the requirements of Rule 15(b)(2) had been met, such action would have been time barred under Federal Rule of Bankruptcy

## CONCLUSION

For the reasons stated, the bankruptcy court's order dismissing the Plaintiffs' complaint is AFFIRMED.

---

Procedure 1017(e)(1). By the Plaintiffs' own admission, the issue was allegedly first raised in their pretrial statement which was filed well beyond the deadline for objections to discharge (which is 60 days after the first date set for the meeting of creditors). Moreover, there is nothing in the record to indicate that the Plaintiffs requested an extension before the time expired. In addition, as stated by the bankruptcy court, "any questions pertaining to income and expenses or the other bankruptcy Schedules were reviewed by the Chapter 7 Trustee, who filed a report of no distribution in this case on December 12, 2011." (Opinion Tr. 37:25 - 38:3).